**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TELADOC STOCKHOLDER DERIVATIVE LITIGATION | Case No. 1:22-cv-06791-DLC |
| This Document Relates to: ALL ACTIONS | **DEMAND FOR JURY TRIAL** |

**VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Elizabeth Vaughn and Trevor Hendry (together, "Plaintiffs"), by and through their undersigned attorneys, bring this derivative complaint for the benefit of nominal defendant, Teladoc Health, Inc. ("Teladoc" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and contribution for violations of Sections 10(b) and 21D of the Exchange Act. Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Teladoc with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.     NATURE AND SUMMARY OF THE ACTION

1.     Teladoc offers virtual healthcare services through business-to-business ("B2B") and direct-to-consumer ("D2C") distribution channels. Its D2C channel is "most prominently" served through the BetterHelp brand.

2.     In October 2020, Teladoc acquired Livongo Health, Inc. ("Livongo") for approximately $18.5 billion (the "Livongo Acquisition"). This record-setting deal was critical to

1

Teladoc's growth strategy and ability to fend off growing competition. Its success, however, hinged on the Company's ability to integrate its existing platform with that of Livongo's.

3.     Between February 2021 and April 2022, the Individual Defendants (as defined below) claimed that the Company was successfully integrating Livongo, growing competition would not materially affect Teladoc's business, and that the Company maintained adequate internal controls. The individual Defendants further claims the Company was poised for 25% to 35% revenue growth for fiscal 2022, despite a pause in the employer market and elongated sales cycles. These statements, which were intentionally or recklessly made or permitted by the Individual Defendants, were eventually revealed as false and misleading.

4.     On April 27, 2022, after the market closed, the truth was partially revealed when Teladoc announced a shortfall in revenue for first quarter 2022 and lowered its fiscal 2022 guidance. The revision was primarily attributed to BetterHelp's poor performance, which in turn was caused by increased competition from new entrants. On this news, the Company's share price fell $22.48, or over 40%, to close at $33.51 per share on April 28, 2022. The full truth was revealed on July 27, 2022 when Teladoc announced a goodwill impairment charge of $3.0 billion. On this news, the price of Teladoc's stock price fell $7.64 per share, or 17.67%, to close at $35.60 per share on July 28, 2022.

5.     These revelations precipitated the filing of a securities class action in this District against Teladoc and certain of the defendants named herein, captioned *In re Teladoc Health, Inc. Securities Litigation*, Case No. 1:22-cv-04687 (the "Securities Class Action").

6.     Plaintiffs did not make a litigation demand prior to filing this action because such action would have been futile based upon the composition of the Board and the actions taken by the Board, as alleged herein.

## II.     JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act and contribution for violations of Section 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiffs**

9.      Plaintiff Elizabeth Vaughn purchased shares of Teladoc stock in March 2020 and has continuously owned her Teladoc stock since that date.  She currently owns 90 shares.

10.     Plaintiff Trevor Hendry purchased shares of Teladoc stock in June 2018 and has continuously owned his Teladoc stock since that date.  He currently owns 68 shares.

**Nominal Defendant**

11.     Nominal Defendant Teladoc is a Delaware corporation with its principal executive offices located at 2 Manhattanville Road, Suite 203, Purchase, New York 10577.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "TDOC."

**Defendants**

12.     Defendant Jason Gorevic ("Gorevic") has served as Chief Executive Officer ("CEO") and as a director of the Company since June 2009. He is named as a defendant in the Securities Class Action.

13.     Defendant Mala Murthy ("Murthy") has served as the Company's Chief Financial Officer ("CFO") since June 2019. She is named as a defendant in the Securities Class Action.

14.     Defendant Karen L. Daniel ("Daniel") has served as a director of the Company since November 2020. She is a member of the Audit Committee.

15.     Defendant Sandra L. Fenwick ("Fenwick") has served as a director of the Company since November 2020.

16.     Defendant William H. Frist ("Frist") has served as a director of the Company since September 2014.

17.     Defendant Catherine A. Jacobson ("Jacobson") has served as a director of the Company since February 2020. She is a member of the Audit Committee.

18.     Defendant Thomas G. McKinley ("McKinley") has served as a director of the Company since November 2009.

19.     Defendant Kenneth H. Paulus ("Paulus") has served as a director of the Company since February 2017.

20.     Defendant David L. Shedlarz ("Shedlarz") has served as a director of the Company since September 2016. He is the Chair of the Audit Committee.

21.     Defendant Mark Douglas Smith ("Smith") has served as a director of the Company since October 2018.

22.     Defendant David B. Snow, Jr. ("Snow") has served as a director of the Company since February 2014 and as Chairman of the Board since December 2014.

23.     Defendants Gorevic, Murthy, Daniel, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow are sometimes referred to hereinafter as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers, directors, and/or fiduciaries of Teladoc and because of their ability to control the business and corporate affairs of Teladoc, at all relevant times, the Individual Defendants owed Teladoc and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Teladoc in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Teladoc and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Teladoc and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Teladoc, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Teladoc, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

26.     To discharge their duties, the officers and directors of Teladoc were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Teladoc were required to, among other things:

> (a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

5

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

27.     Teladoc offers virtual healthcare services through business-to-business ("B2B") and direct-to-consumer ("D2C") distribution channels. Its customers consist of employers (including approximately 50% of the Fortune 500), health plans, hospitals and health systems, insurance and financial services companies. Its D2C channel is "most prominently" served through the BetterHelp brand.

28.     Because the Company operates an integrated virtual care system, Teladoc has determined that it operates as a single reportable segment, *i.e.* health services.

### B.     The Individual Defendants Cause the Company to Issue Materially Misleading Statements

29.     On February 24, 2021, the Company held an earnings call to discuss the Company's fourth quarter 2020 financial results. During that call, Defendants touted the Company's integration of Livongo. For example, Defendant Gorevic stated, "[o]ur commercial organization is now fully integrated, and our teams responsible for cross-selling have been collaborating for months." Defendant Gorevic also stated "[t]he integration of our data platform and assets also continues to progress…"

30.     When directly asked about "competition in the marketplace," Defendant Gorevic made no mention of an increased competition nor any adverse impact that such competition was having on the Company's financials.   Instead, Defendant Gorevic responded, with respect to competition:

> When I look at our membership opportunities, sort of the growth opportunities in our pipeline, the membership opportunity is up over 50% relative to the same time last year. And I think that that's really indicative of the market and clients recognizing the value of the full solution that we have and the unique position that we occupy. And I've had a number of large client discussions over the last several weeks as we start to move into this selling season and we start to talk about the opportunity of the full credit answer, sort of that full solution across all of our product portfolio, and it is truly differentiated. So I was just talking to a regional Blue plan, who, I believe, we will take away from a competitor who has a much narrower set of products and can't compete in the evolving landscape and sort of the new paradigm that we've created.

31.     According to the Amended Complaint in the Securities Class Action (see ECF No. 52), multiple former Company employees, identified therein as confidential witnesses ("CWs"), confirmed, among other things, that Teladoc was not successfully integrating Livongo. For instance, CW 4, who communicated directly with Defendant Gorevic, stated that it became apparent to her by around three months after the Livongo Acquisition that Teladoc did not know how to use and integrate Livongo.[1]

32.     On the same earnings call, Defendant Gorevic further touted the Company's competitive position.  For example, in response to a JPMorgan analyst's question about retention rates, competition in the marketplace," and "want[ing] to understand how you're thinking about

---

[1] According to Teladoc's SEC filing, one of the strategic considerations that the Board considered when approving the merger was "the belief that Livongo is the largest and most comprehensive provider of personalized chronic condition management, with a differentiated data-driven health experience that enables better outcomes and is fully scalable across multiple chronic conditions."

the competitive market right now around what you saw on the retention side," Defendant Gorevic

responded:

> With respect to retention rates, they continue to be at high levels, consistent with
> historic levels, which have always been in sort of the low to mid-90s. We continue
> to see that. And in fact, what we' re seeing is the pipeline is growing actually faster
> than we've seen in previous years.
>
> I've had a number of large client discussions over the last several weeks as we start
> to move into this selling season and we start to talk about the opportunity of the full
> credit answer, sort of that full solution across all of our product portfolio, and it is
> truly differentiated. So I was just talking to a regional Blue plan, who, I believe, we
> will take away from a competitor who has a much narrower set of products and
> can't compete in the evolving landscape and sort of the new paradigm that we've
> created.

33.    During a March 15, 2021 interview, when asked about the integration of Livongo,

Defendant Gorevic stated:

> Yeah very well [] in fact I would say [] as well as I could possibly have hoped for.
> Um you know there are certainly challenges.  As I said we've never been in the
> same room together right?  I mean it is it is amazing to me.  I have whole teams of
> people all around the the world now who I've never met so I am anxious quite
> frankly to go on the tour and start to uh to be face to face with those teams.  But
> what what makes it successful I think is a common mission right? We are but we're
> both mission-driven organizations uh and and that alignment there is really critical.
> [][T]he vision for what the future should look like and the role that we can play
> [] is really critical [] because those things are unifying right?  The strategy then falls
> out of that and [] we're working as a joint team to continue to refine that strategy.
> It'll be a refining not a re-architecting [] of the strategy [] and it's warranted given
> the acceleration in the market [] and [] the opportunity and the possibilities that are
> now open to us. And then lastly it's culture.  You know I [] think for me the sun
> sort of rises and sets on strategy and culture and one without the other is insufficient.
> And the the cultural alignment is very strong.  Both companies have incredibly
> collaborative collegial cultures that are really oriented to doing the right thing []
> and [] our values are very very strong and similar.  So [] you know from my
> perspective those are the ingredients for successful integration and everybody's
> really aligned on [] wanting to make a big difference.  So [] so far, so good [] [and]
> that has manifested itself in some good commercial wins and you know there
> there's nothing unifying like winning together.  [][S]o that's been really positive []
> and I'm confident that we're going to see more of that.

34.    On April 28, 2021, Defendants held an earnings call to discuss the Company's first

quarter 2021 financial results. During the call, Defendant Gorevic reiterated to investors that the

they had "made considerable progress" with the Livongo integration and that the commercial organization was "fully integrated":

> Turning to an update on integration. We've made considerable progress across our key work streams. As we previously noted, our commercial organization has been fully integrated with sales teams selling across the entire whole-person portfolio of products since early this year. We've now closed several deals for our new integrated mental health product that combines the Teladoc therapists and psychiatrists with the Livongo digital mental health capabilities to deliver a market-leading solution.

35.    Defendant Murthy also responded to an analyst's question about integration, further touting the Company's "very, very clear road map" to integrating the companies, particularly their products given she specifically referred to Teladoc's "R&D," i.e., research and development efforts on that front, and claiming that they were "well on our way" to completing "deep" "data integration":

> I'd also add, Stephanie. The good thing is we have a very, very clear road map. And we have spent a fair amount of time as a leadership team, prioritizing that road map, so that the investments we've put against that, as we have talked about, I expect 2021 to be an investment year, it is stacked and aligned against those very clear priorities in the R&D road map. Whether it be in terms of data integration, as you asked, recognizing a unique member from an eligibility and an identity perspective, that requires deep integration. And I would say we are well on our way to do it.

36.    Defendants also downplayed any increased competition. For example, in response an analyst's questions about the Company's "most recent thoughts on competition" and how the "competitive landscape has really shifted and changed over the last couple of years," such as the entry of Amazon Care and other competitors into this telehealth space, Defendant Gorevic responded that "all of those moves are sort of within the realm of what we expected" and "many of [these competitors] we almost never bump into, and some of the new entrants we're just not seeing gain traction."

37.    On May 11, 2021, during an interview with CNBC, Defendant Gorevic again downplayed competitive pressures and highlighted the features that purportedly differentiate

Teladoc from its competitors. Citing the Company's purportedly "unified, integrated" whole-person products, Defendant Gorevic stated: "If you look at our 2020 selling season, about 2/3 of our bookings were multi-product bookings and I think that really speaks to the market demand and consumer demand for unified integrated solutions."

38.     On June 1, 2021, during the 41st Annual William Blair & Company Growth Stock Conference, Defendant Gorevic rejected any notion that Teladoc was being impacted by smaller competitors:

> The truth is that although large and sort of headline making, the ones that you mentioned [i.e., Amazon; Walmart], we really never bump into and mostly, it's because they're just in the very, very, very early days of sort of deciding even what they want to be, much less compete in the marketplace. And then you have a lot of smaller point solutions, and this really gets to -- and you and I have discussed before, we win because of our multiproduct breadth of solutions, and that's evident in our data about the sales that we booked as well as the revenue per member and things like that. And that's a significant competitive advantage. So we don't actually see much in the way of single product sales anymore because that's not what buyers are looking for.

39.     On October 27, 2021, the Company held a conference call in connection with its third quarter 2021 financial results. During the call, defendant Gorevic provided preliminary fiscal 2022 guidance, expecting revenue of $2.6 billion, and downplayed the headwinds affecting Teladoc's chronic care business. Specifically, he stated, in relevant part:

> I want to provide some initial perspective on our expectations for 2022. As you know, it's not our typical practice to comment on forward outlook at this point in the year. But we believe the additional color is appropriate given our insights at this stage of the selling season and our outlook on consolidated revenue growth for next year. First, we are as confident as ever in our multiple levers for growth in 2022 and beyond. Our unique ability to deliver longitudinal, Whole-person care is a significant competitive advantage. And our leading position in all B2B and DTC channels enables us to fuel continued growth.

> Given our insights at this stage of the selling season, ***our preliminary outlook for consolidated revenue next year is approximately $2.6 billion*** . . . . Chronic care is just one of those levers for growth and is increasingly converging with others . . . . However, as we work through the 2022 planning process, ***we expect to be more conservative about growth expectations for standalone Chronic Care.***

> ***Our preliminary outlook assumes standalone Chronic Care revenue will grow
> approximately 25% to 35%.*** And we believe strongly that our Chronic Care
> capabilities will also continue to unlock growth across our integrated suite of
> products and solutions. Our Whole-person care approach is clearly resonating with
> clients and consumers as their expectations for virtual healthcare delivery continue
> to move up the value chain and expand from transactional episodic demand toward
> integrated longitudinal care

40.     Part of this conservatism was purportedly due to a pause in the employer market.

Specifically, defendant Gorevic stated:

> [W]e're trying to be very realistic about the sort of on-ramp of those clients in the
> health plan segment. With respect to the employer market, that's a market where
> our products are extremely attractive. And historically, we've been very successful
> at selling into the employer market directly when we sell directly to large
> employers. That's a market where the benefits managers have, I would say, paused
> over the course of this year more than we've seen it in the past and it's really due
> to COVID and them being focused on the pandemic and return to work.

41.     During the call, defendant Gorevic acknowledged the slowdown in two other

chronic care channels, but claimed it was "positively offset" by Teladoc's growth in other markets,

stating in relevant part:

> And then there are two channels that I would say are just moving a little more
> slowly than we had originally anticipated. And again, we want to be conservative
> in our outlook. The broker channel, we had high expectations and we're just starting
> to see that pick up now. It took a while to educate the brokers.
>
> We have a large distributed broker network. And it took a little while to educate
> them on a product set that they really didn't have access to before. We're now
> starting to see that pick up substantially and we're excited about next year's selling
> season for that. And then lastly, International. I think the international markets, we
> have to go through some both regulatory hurdles in terms of local certifications and
> approvals, but also localizing our products to various international markets. And
> we're doing that in a fairly methodical approach, market-by-market. So, I think we
> will see growth internationally, but we don't have, really, anything in our plan for
> next year on a substantial basis.
>
> And then maybe the last thing I'll say is that's been -- I would say positively offset
> by our growth in the hospital and health system market where we've, we've noted
> before that we've seen especially risk-bearing hospitals really lean into the Chronic
> Care solutions. And that's going better than we had expected. So, when you put all
> of that together and we take, I would say critical look at the pipeline and our

11

forecast, that's where we landed on that 25% to 35% outlook. Again, that's a contributor to our overall outlook of approximately 2.6 billion in revenue next year.

42.     On February 22, 2022, the Individual Defendants caused Teladoc to announce its fourth quarter and full year 2021 financial results in a press release, highlighting its "[f]ull year 2022 Revenue guidance of $2.55 to $2.65 billion, representing 25% to 30% growth."

43.     The same day, Teladoc held a conference call to discuss the financial results with analysts and investors. During the call, defendant Gorevic reiterated that the Company would experience "strong growth," stating in relevant part:

> For [FY 2022], we expect revenue to be in the range of $2.55 billion to $2.65 billion, representing growth of 25% to 30%. Our expectations for strong growth are a result of the broad-based momentum we continue to see across our suite of products and services and across geographies. We have over 90 million total individuals with access to the Teladoc platform today, and we see a significant opportunity for long-term growth by expanding our relationships and going deeper with our existing clients and members as we execute against our key strategic priorities across primary care, mental health and chronic care solutions.

44.     During the same call, defendant Murthy affirmed the guidance in the press release:

> For [FY] 2022, we expect revenue to be in the range of $2.55 billion to $2.65 billion, representing growth of 25% to 30% over the prior year. We expect total membership of 54 million to 56 million members, representing growth of 1% to 5% year-over-year, with the remainder of revenue growth driven by expanding revenue per member driven both by increased product penetration and product mix.
>
> We expect adjusted EBITDA in 2022 to be in the range of $330 million to $355 million, representing a 12.9% to 13.4% adjusted EBITDA margin and an expansion of approximately 90 to 140 basis points over 2021 after normalizing for last year's purchase price accounting benefit. We expect total visits in 2022 to be between 18.5 million and 20 million visits, representing growth of 20% to 30% over the prior year.

45.     During the same call, defendant Murthy provided additional color for the fiscal 2022 expectations:

> On the revenue side, we expect the timing of new chronic care client onboarding to be more heavily weighted towards the second half of this year. This includes the launch of large new health plan clients signed over the past several months . . . which are scheduled to onboard in the second half of this year. We, therefore,

expect to see strong sequential growth in revenue over the course of the year. Specific to the second quarter, we expect an approximate $40 million to $50 million step-up in revenue from 1Q to 2Q.

On the expense side, we normally see higher engagement marketing spend in the first half of the year as we prepare to onboard new clients and members. It's also typical for us to see higher advertising spend early in the year as we take advantage of lower media pricing in the market following the conclusion of the more expensive holiday season. We expect that to be the case again this year, as we have seen a more advantageous media buying landscape early this year, which has resulted in a slightly lower customer acquisition cost.

This will impact the quarterly cadence of adjusted EBITDA, and we expect will result in a significant margin expansion progression over the course of 2022, particularly in the second half due to our expected revenue and enrollment ramp for the chronic care programs launching later this year as well as the typical seasonality of advertising spend over the course of the year.

46.     Management purportedly had visibility into fiscal 2022 results because the guidance was based on "contracts that have been signed" and was "not dependent on significant new sales." Specifically, defendant Murthy stated, in relevant part:

It's important to note that the revenue and EBITDA ramp described is not dependent on significant new sales. The deals mentioned are contracts that have been signed over the past several months, but are disproportionately scheduled to onboard in the second half [of 2022]. And we, therefore, have good visibility into the second half revenue and EBITDA progression.

47.     On February 28, 2022, the Individual Defendants signed and caused Teladoc to file its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K"), affirming the previously reported financial results. It also represented that BetterHelp would "continue driving growth" for the Company, stating in relevant part:

We plan to continue driving growth through investments in our D2C channels . . . . BetterHelp is the leader in the D2C therapy market, both in terms of the number of individuals enrolled and the number of providers who provide services on the platform. The scale of our data and provider network, powered by our data science capabilities, creates a competitive advantage for us in providing an optimal match of an individual with a provider, increasing the rate of success in therapy. We leverage diverse customer acquisition channels and increased organic sources of traffic, which reduces dependence on any single source of member acquisition. Even with our strong historical growth, we believe there is substantial untapped

growth potential, both domestically and internationally, as almost half of BetterHelp members have never sought therapy before.

48.     The above statements in ¶¶ 28-36 were materially misleading because they failed to disclose: (1) that Teladoc's BetterHelp business was disproportionately impacted by increased competition; (2) that, as a result, the Company was experiencing slowing growth; and (3) that, as a result of the foregoing, Teladoc was reasonably likely to recognize a significant non-cash goodwill impairment charge.

### C.     The Truth Begins To Emerge

49.     On April 27, 2022, after the market closed, Teladoc announced its first quarter 2022 financial results in a press release, including revenue of $565.4 million and net loss per share of $41.58, which was "primarily driven by [a] non-cash goodwill impairment charge of $6.6 billion or $41.11 per share." The Company also lowered its fiscal 2022 revenue guidance to $2.4 - $2.5 billion and adjusted EBITDA guidance to $240 - $265 million "to reflect dynamics we are currently experiencing in the [D2C] mental health and chronic condition markets." According to defendant Gorevic, "[i]n the chronic condition market, we are seeing an elongated sales cycle as employers and health plans evaluate their long-term strategies to deliver the benefits and care that their populations need."

50.     During a conference call held the same day, defendant Gorevic attributed the shortfall and reduced expectations to BetterHelp's poor performance:

> Over the past several weeks, we've seen lower-than-expected yield on marketing spend for BetterHelp, which is a reversal of the trends we experienced exiting 2021 and in the early part of 2022. One example of this is paid search advertising, where we've seen a notable increase in rates for keywords associated with online therapy. We believe the biggest driver of this dynamic is smaller private competitors pursuing what we think are low- or no-return customer acquisition strategies in an attempt to establish market share.

> Some of those same providers are also exploiting the temporary suspension of certain regulations associated with the national health emergency concerning the

14

prescription of controlled substances. We believe these strategies are unsustainable in the long-term. This dynamic is likely to persist at least throughout the remainder of this year, however, resulting in growth and margin contribution from BetterHelp that is below our expectation in February.

*        *        *

[G]iven the persistency of these trends over the past several weeks and the broader economic backdrop, we've incorporated this updated view into our forward outlook, including an assumed 10% lower revenue yield per dollar of ad spend for the full year.

51.     BetterHelp's underperformance was the primary reason for Teladoc's revised guidance. Specifically, Defendant Gorevic stated:

When comparing the impact to guidance from the items we've just discussed, approximately three quarters of the reduction to our 2022 revenue outlook is driven by lower expected growth at BetterHelp with the remainder primarily attributed to the lower expected revenue from our suite of chronic care products.

For adjusted EBITDA, approximately two thirds of the reduction is driven by lower yield on advertising spend from BetterHelp. The remainder of the revision is driven primarily by our lower chronic care revenue outlook as well as a modest increase in our assumption for wage growth due to higher inflation as we grow our headcount in technology and development.

As a result of these updates, we now expect revenue of $2.4 billion to $2.5 billion and adjusted EBITDA of $240 million to $265 million for fiscal year 2022 . . . . We are not providing today any guidance with respect to periods after 2022, and we're evaluating whether there will be effects to our long-term revenue growth outlook.

52.     Defendant Gorevic also stated that bookings slowed as Teladoc faced competition from new entrants:

[W]e're also seeing our chronic care sales pipeline developed more slowly than anticipated. Last October, we discussed two trends in the marketplace that we saw leading to an elongated selling cycle. The first was in the employer market, where we saw benefit managers focused on COVID and return to work, which we felt was contributing to a longer decision-making process. The second was a large pipeline of health plan deals that were simply harder to predict when it comes to timing given the size and complexity of those clients.

At the beginning of this year, we were encouraged by very strong fourth quarter bookings and a robust late-stage pipeline. However, as we progressed through the

first part of the year, we're seeing clear signs of the slower bookings pace continuing.

In addition to the factors we discussed last fall, we're seeing clients inundated with a number of new smaller point solutions, which has created noise in the marketplace . . . . [W]e are in the process of taking a closer look at some of these forces that are impacting the near-term conversion of pipeline to revenue, and we'll continue to make adjustments as necessary to address them.

. . . [W]e're not seeing deals progress at the pace that we expected.

53.     On this news, the Company's share price fell $22.48, or over 40%, to close at $33.51 per share on April 28, 2022, on unusually heavy trading volume.

54.     On July 27, 2022, the full truth was revealed when Defendants announced the Company's second quarter 2022 financial results ("Q2 FY 2022 Press Release"). Notably, Teladoc reported a "[n]et loss per share of $19.22, primarily driven by [a] non-cash goodwill impairment charge of $3.0 billion, or $18.78 per share." The Q2 FY 2022 Press Release also reported a net loss of $3.1 billion or $19.22 per share for the second quarter of 2022, compared to $133.8 million, or ($0.86) per share, for the second quarter of 2021.  Similarly, the Company reported that its adjusted EBITDA "decreased 30% to $46.7 million."

55.     Later that day, Defendants held an earnings call to discuss the Company's second quarter 2022 financial results ("Q2 FY 2022 Earnings Call"). During that call, Defendant Murthy admitted that the Company's product platforms (including Livongo's) were still not yet fully integrated:

We've talked about investing in our integrated platform in new capabilities in new products, such as my strength of fleet Primary360, Chronic Care Complete, continued integration of our data that underpins bringing together all of our suite of products. That still continues.

56.     Similarly, Defendant Murthy further stated that "I would expect Chronic Care revenue growth to be towards the low end of the low to mid-teens." In addition, Defendant Gorevic further revealed that the Company was experiencing deals progressing at a slower rate in Teladoc's

Chronic Care business (i.e., the Livongo business), which the Company contributed to competitive pressures:

> While we were pleased to exceed our member enrollment targets during the quarter, we are continuing to see our pipeline of Chronic Care deals developed more slowly than we anticipated at the start of the year, as we discussed in our first quarter call. It remains early in the selling season, but deals continue to progress at a slower pace. We believe at least in part due to competitive noise as the market transitions from stand-alone point solutions to integrated whole-person virtual care.

57.     The July 27, 2022 disclosures about the additional $3 billion goodwill impairment charge and the continued adverse impact of competition were foreseeable consequences of Defendants' misrepresentations and omissions concerning Teladoc's then-current state of its integration process and market position.   Moreover, the disclosures revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding purportedly successful integration of the Livongo Acquisition and the Company not being adversely impacted by growing competition.

58.     On this news, the price of Teladoc's stock price fell $7.64 per share, or 17.67%, to close at $35.60 per share on July 28, 2022.

**D.     The Individual Defendants Caused Teladoc to Issue a Materially Misleading Proxy Statement**

59.     On April 12, 2022, defendants Gorevic, Daniel, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held May 26, 2022. In the proxy statement, these ten directors solicited stockholder votes in favor of four management proposals, including the reelection of those ten directors to new terms.

60.     The proxy statement disclosed that the Board had determined that Gorevic was not independent.

61.     It stated that the Audit Committee was responsible for risks with respect to financial reporting. Specifically, the proxy statement stated, in relevant part:

KEY RESPONSIBILITIES

The principal functions of the Audit Committee are to:

- select, approve the compensation, and assess the independence of our independent registered public accounting firm

- review and approve management's plan for engaging our independent registered public accounting firm during the year to perform non-audit services and consider what effect these services will have on the independence of our independent registered public accounting firm

- review our annual financial statements and other financial reports which require review and/or approval by the Board

- oversee the integrity of our financial statements and our systems of disclosure and internal controls over financial reporting and our compliance with legal and regulatory requirements

- review the scope of audit plans of our independent registered public accounting firm and the results of its audit

- evaluate the performance of our independent registered public accounting firm

- review our quarterly earnings releases

- review all related-party transactions for potential conflicts of interest and approve all such transactions

- review and evaluate our risk management plans, including cybersecurity and data privacy compliance

62.     The proxy statement was materially misleading because it misrepresented the Board's activities with respect to risk management and financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties. A reasonable shareholder would have found the truth to be material when deciding to vote for or against these proposals.

18

63.     On June 2, 2022, Teladoc filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the proxy statement. In particular, defendants Gorevic, Daniel, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow were reelected to new terms as directors. The reelection of these ten directors based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and their continued enrichment at the expense of the Company's unaffiliated stockholders.

## VI.     DAMAGES TO THE COMPANY

64.     As a direct and proximate result of the Individual Defendants' conduct, Teladoc has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

     a)     Any funds paid to settle the Securities Class Action; and

     b)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Teladoc.

65.     In addition, Teladoc's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

66.     The actions complained of herein have irreparably damaged Teladoc's corporate image and goodwill.  For at least the foreseeable future, Teladoc will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Teladoc's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67.     Plaintiffs bring this action derivatively in the right and for the benefit of Teladoc to redress injuries suffered, and to be suffered, by Teladoc as a direct result of the wrongdoing alleged herein.  Teladoc is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

68.     Plaintiffs will adequately and fairly represent the interests of Teladoc in enforcing and prosecuting its rights.

69.     Plaintiffs have continuously been shareholders of Teladoc at times relevant to the wrongdoing complained of and are current Teladoc shareholders.

70.     When this action was filed, Teladoc's Board of Directors consisted of defendants Gorevic, Daniel, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow. Plaintiffs did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below. Each of these Defendants face a substantial risk of liability for, individually and collectively, violating and breaching their fiduciary duties of candor, good faith, and loyalty to Teladoc stockholders. These Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs.

71.     Defendants Gorevic, Daniel, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow made, authorized and/or permitted the false statements alleged herein to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it. These Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director

Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

72.     The Board willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

73.     The Board failed to exercise oversight in good faith over the Livongo integration and the effectiveness of Teladoc's internal controls.

74.     Gorevic is the Company's CEO and therefore is not independent under NYSE listing rules. As an employee, Gorevic derives substantially all of his income from his employment with Teladoc, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis. He is also named as a defendant in the Securities Class Action and personally made many of the false and misleading statements alleged herein. As a result, demand is futile as to him.

75.     Daniel, Jacobson, and Shedlarz also served as members of the Audit Committee at relevant times. As such they are responsible for the integrity of Teladoc's disclosures. In their capacities as Audit Committee members, Daniel, Jacobson, and Shedlarz reviewed and approved the materially misleading statements and allowed them to be disseminated in Teladoc's SEC filings and other disclosures. Thus, Daniel, Jacobson, and Shedlarz breached their fiduciary duties  and are not disinterested, and demand is excused as to them.

76.     The entire Board is charged with overseeing the Company's affairs, including the BetterHelp and chronic care businesses, which are Teladoc's core business. In this respect, the entire Board knew or should have known of the material facts concerning these businesses,

including the headwinds affecting these segments, as well as the accuracy of the Company's public reporting. In their capacities as directors, Gorevic, Daniel, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow issued materially misleading statements, including the 2021 10-K, and face a substantial likelihood of liability.

77.     Gorevic, Daniel, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow could not disinterestedly consider a demand because they issued the 2022 proxy statement misrepresenting the Audit Committee's activities with respect to risk management and financial reporting. As a result of the misleading proxy statement, all ten directors were reelected to new terms, including Daniel, Jacobson, and Shedlarz who serve on the Audit Committee.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

78.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

79.     The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Teladoc's business and affairs, particularly with respect to issues as fundamental as public disclosures.

80.     The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Teladoc.

81.     In breach of their fiduciary duties owed to Teladoc, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

82.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report Company's overall prospects.

83.     As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, Teladoc has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

**(Against Defendants Gorevic and Murthy for Contribution
For Violations of Sections 10(b) and 21D of the Exchange Act)**

84.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

85.     The conduct of Defendants Gorevic and Murthy, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

86.     Teladoc is named as a defendant in related securities fraud lawsuit that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Teladoc is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these

Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

87.     As officers, directors and otherwise, Defendants Gorevic and Murthy had the power or ability to, and did, control or influence, either directly or indirectly, Teladoc's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

88.     Defendants Gorevic and Murthy are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

89.     Defendants Gorevic and Murthy have damaged the Company and are liable to the Company for contribution.

90.     No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## <u>COUNT III</u>

**(Against Defendants Gorevic, Daniel, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow For Violations of Section 14(a) of the Exchange Act)**

91.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

92.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed

on April 12, 2022 violated §14(a) and Rule 14a-9 because it solicited stockholder approval for director reelection while failing to disclose material facts about Teladoc's business.

93.     In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

94.     The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The proxy statement solicited stockholder votes for: (i) director reelection; (ii) executive compensation; (iii) ratification of the Company's independent accounting firm; and (iv) amendment to Teladoc's Certificate of Incorporation to permit certain stockholders to call special meetings. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

95.     The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

### COUNT IV

**Against The Individual Defendants For Aiding and
Abetting Breach of Fiduciary Duty**

96.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

## COUNT V

### Against The Individual Defendants For Unjust Enrichment

98.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Teladoc.

100.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Teladoc that was tied to the performance or artificially inflated valuation of Teladoc, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

101.    Plaintiffs, as shareholders and representatives of Teladoc, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT VI

### Against The Individual Defendants For Waste Of Corporate Assets

102.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

104.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and colleting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

105.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of Teladoc, demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of Teladoc and that Plaintiffs are adequate representatives of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Teladoc;

D.    Directing Teladoc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Teladoc and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

    3.      a proposal to strengthen Teladoc's oversight of its disclosure procedures;

    4.      a provision to control insider transactions; and

    5.      a provision to permit the stockholders of Teladoc to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Teladoc has an effective remedy;

F.      Awarding to Teladoc restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: November 28, 2022        By:   *s/ Benjamin I. Sachs-Michaels*
                                 **GLANCY PRONGAY & MURRAY LLP**
                                 Benjamin I. Sachs-Michaels
                                 745 Fifth Avenue
                                 New York, New York 10151
                                 Telephone: (212) 935-7400
                                 E-mail: bsachsmichaels@glancylaw.com

                                            -and-

                                 Robert V. Prongay
                                 Pavithra Rajesh
                                 1925 Century Park East, Suite 2100
                                 Los Angeles, California 90067
                                 Telephone: (310) 201-9150
                                 E-mail: rprongay@glancylaw.com
                                         prajesh@glancylaw.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra
Vincent A. Licata
825 East Gate Blvd., Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
       tjm@rl-legal.com
       gms@rl-legal.com
       vl@rl-legal.com

*Co-Lead Counsel for Plaintiffs*

**ROSCA SCARLATO LLC**
Alan Rosca
23250 Chagrin Blvd., Suite 100
Beachwood, OH 44122
Telephone: (216) 946-7070
Email: arosca@rscounsel.law

Paul Scarlato
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Email: pscarlato@rscounsel.law

*Additional Counsel for Plaintiff Elizabeth Vaughn*

## **VERIFICATION**

I, Elizabeth Vaughn, do hereby verify that I am a holder of common stock of Teladoc Health, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Consolidated Stockholder Derivative Complaint ("Complaint").  I have authorized the filing of the Complaint.  I have reviewed the Complaint.  All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: *Nov. 24, 2022*

Elizabeth Vaughn

**<u>VERIFICATION</u>**

I, Trevor Hendry, do hereby verify that I am a holder of common stock of Teladoc Health, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Consolidated Stockholder Derivative Complaint ("Complaint").  I have authorized the filing of the Complaint.  I have reviewed the Complaint.  All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 11/25/2022

*Trevor Hendry*
Trevor Hendry